STATE *v.* HERMENGILDE LIZOTTE.

February Term, 1938.

Present: POWERS, C. J., SLACK, MOULTON, SHERBURNE and BUTTLES, JJ.

Opinion filed February 25, 1938.

380

*J. W. Redmond* for the respondent.

*Alban J. Parker,* Deputy Attorney General; and *Maxwell L. Baton,* State's attorney, for the State.

Moulton, J. The respondent has been found guilty of the crime of maliciously burning the barn of George Tetreault, under P. L. 8421, and has brought the cause here on exceptions.

The evidence for the State tended to show the following facts: George Tetreault and Rose, his wife, owned a farm as tenants by the entirety. The barn, ninety by thirty-six feet, containing ninety-five tons of hay, stood on the easterly side of the highway, and the dwelling house was situated on the westerly side, southerly of the barn, and 126 feet distant from it at the nearest point. The family consisted of George and Rose Tetreault, their two children and Rose's father, the respondent, who was seventy-two years old, and, it would seem, of uncertain temper, and who worked for his son-in-law for his board, lodging, clothes and tobacco, but no wages. The children slept in a room in the northeast corner of the house, on the ground floor; the Tetreaults occupied the room on the southwest corner on the ground floor; the respondent's room was directly above the children's.

At 9.20 on Sunday morning, August 29, 1937, George Tetreault took his wife and children to mass, and the respondent was left alone in the house. Just before starting out, George received a message from his brother saying that the latter's wife was ill, and asking him to get some help. Accordingly, George took his wife and children to the church, went on to his mother's, and took her to his brother's house. He passed by his own place on the way, some twenty to twenty-five minutes after he had left it, and noticed nothing abnormal; but one-half to three-quarters of an hour later, while he was at his brother's, he received word that his barn was burning. The fire was observed by some neighbors at about 10.15 o'clock. Shortly thereafter it was discovered that the children's room was on fire, the curtains were burned, the window sill and casing scorched, and the cover of a

sewing machine, which stood under the window, was burned, and the machine itself showed the effects of fire. The windows of this room were closed. At the same time, another fire was found in the Tetreaults' room, whereby the curtains and pillows and blankets, and the mattress on the bed, were burned, and the furniture, window sill and floor blackened and scorched. The only window of this room was on the south side and was closed, and was opened by a neighbor to permit water to be thrown on the fire. There was no fire in the stove in the house.

The respondent testified that he went to his room after breakfast and slept, but awakened about 9 o'clock, when, looking out of the window, he saw the barn on fire. He then collected all his clothing, shaving utensils and tobacco, put them in a sack and removed them from the house. But the driver of the milk truck, who stopped at the farm between 9.30 and 10 to pick up the full cans and leave the empty ones, testified that he saw no indication of fire, and the Tetreaults said that no fire was visible when the family left for church at 9.20. When George Tetreault arrived the roof of the barn was falling in. The wind was blowing from the northwest, so that the flames and sparks were carried away from the house. While the neighbors were engaged in removing the contents of the barn the respondent stood quietly near the house, looking at the conflagration, without offering or giving any help.

■■ There was evidence of threats made by the respondent against Tetreault and his wife. On one occasion he seized a piece of wood and told Mrs. Tetreault that she ''would end from his hands.'' At another time he said that some day he would cut Mrs. Tetreault's throat with a butcher knife and throw her into the cellar. Again he said that if he could not get his salary he would burn the buildings, or get even with Tetreault in some way. That threats of bodily harm, made by the respondent, and directed toward one of the owners of the property, are admissible in a prosecution for arson as tending to show malice and ill will, is too well established to require citation of authorities. See Underhill, Criminal Evidence (3rd ed.), par. 562. And, of course, evidence of a threat to do the particular act charged is admissible. *State* v. *Fenlason,* 78 Me. 495, 501, 7 Atl. 385.

■ Several witnesses were permited to testify, subject to exception by respondent, that he had said that he was going to

seize, or attach, the cows and the hay, if Tetreault did not pay him what he owed him. The ground of the exception was that no hostility or ill will was shown by the statement of one who believes himself to be a creditor to the effect that he will attach the property of his debtor if he is not paid. But the evidence was undisputed, that the respondent was not to receive wages, but only his lodging, board, clothes and tobacco in return for his services; in fact, he himself so testified. There was no claim that the agreed consideration was not furnished by the Tetreaults. Under these circumstances the statements attributed to him had a tendency to show ill will, and were properly received in evidence.

■ In one instance, the statement concerning a proposed attachment of the cattle was interpolated by a witness in response to a question concerning the threat to burn the buildings. No exception was taken to the asking of the question, and the offer did not include the matter. Although this part of the answer was unresponsive, there was no request to strike it out, and the court treated it as under exception. That it was admissible already appears. No prejudice to the respondent appears from this procedure.

■ The fact that these various threats occurred from a few months to three years before the fire did not operate to exclude them. The question of remoteness was one that called for the exercise of the trial court's discretion. *State* v. *Averill*, 85 Vt. 115, 122, 81 Atl. 461, Ann. Cas. 1914B, 1005; *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 119, 130 Atl. 758; *Waterman* v. *Moody*, 92 Vt. 218, 235, 103 Atl. 325; *Commonwealth* v. *Quinn*, 150 Mass. 401, 404, 23 N. E. 54. No abuse of discretion is made to appear.

■ The respondent offered to prove that the buildings were insured in favor of the Tetreaults, and that there was a mortgage on the farm, as tending to show that the Tetreaults themselves had a motive to burn the house and barn. It was claimed, also, that the Tetreaults had an opportunity to set the fire before they departed for church. All connection between them and the respondent with regard to the burning was emphatically disclaimed by respondent's counsel. There was no claim that the premises were overinsured, or that the Tetreaults were pressed for money. The offered evidence was excluded, subject in each instance to respondent's exception.

██ ██ Assuming that the offered evidence had the tendency claimed for it, there was no error in the ruling. "While it is always competent for a respondent to give evidence tending to show that another committed the crime of which he is charged * * *, it is not enough to show merely that another had the motive to commit it." *State* v. *Long,* 95 Vt. 485, 492, 493, 115 Atl. 734, 738. There is nothing in the record to connect the Tetreaults, or either of them, with the burning. The fact that they were at the house until 9.20 a.m., standing alone, is not sufficient to make the offered evidence admissible. It served at best only to cast a bare suspicion, and it was accompanied by no evidence of an overt act. *Irvin* v. *State,* 11 Okla. 301, 146 Pac. 453, 454, 455, and cases cited; *Comm.* v. *Abbott,* 130 Mass. 472, 475.

At the close of the evidence for the State, and again at the close of all the evidence, the respondent moved for a verdict of not guilty. His motions were denied and he excepted. The grounds upon which he relies may be thus summarized: (1) There was no evidence from which the jury could find the *corpus delicti,* in other words, that the fire was of incendiary origin, and (2) that there was no evidence from which the jury could find that the burning was the act of the respondent.

██ The mere fact of the burning of a building is not sufficient to establish the *corpus delicti,* for if nothing more appears it will be presumed that the fire was the result of accident or some providential cause, rather than the result of a criminal design. *Phillips* v. *State,* 29 Ga. 105, 109; *State* v. *Pienick,* 46 Wash. 523, 90 Pac. 645, 11 L. R. A. (N. S.) 987, 988, 13 Ann. Cas. 800; *People* v. *Saunders,* 13 Cal. App. 743, 110 Pac. 825, 827; 2 Wharton, Criminal Law (12th ed.), par. 1063. But the incendiarism may be proved by circumstantial evidence. *State* v. *McCauley,* 132 Minn. 225, 156 N. W. 280, 282; *Cunningham* v. *State,* 14 Ala. App. 1, 69 So. 982, 985.

██ Here we have the evidence that there were three simultaneous fires. The two in the house occurred in separate rooms at some distance apart and there was no fire in the stove from which they could have caught. The theory that they might have been caused by sparks from the barn is met by the undisputed testimony that the windows in each room were closed, and, in the southwest room, the only window was on the south side of

██

the house; and that the direction of the wind was such that the sparks were carried away from, and not toward, the house. These facts were amply sufficient to permit the jury to find that the three fires were not the result of accidental or natural causes, but were the willful act of some person. A case very much in point is *People* v. *Saunders,* 13 Cal. App. 743, 110 Pac. 825, 827, wherein the court said: "But here the physical condition of the premises showed that three separate and distinct fires had been started; and this evidence taken in connection with other evidence tending to show the improbability of the fire being the result of accident, was sufficient to show that the crime of arson had been committed."

■ As to the complicity of the respondent, the evidence that he was the only person upon the premises at the time; his previous exhibitions of ill will toward the Tetreaults; his threat to burn the buildings; the care with which he removed all his personal belongings to a safe place, and the calmness with which he watched the efforts of the neighbors to remove the Tetreaults' property from the burning barn, without the least attempt or offer to help in saving his daughter and son-in-law from loss, made the question of his guilt a matter proper for the consideration of the jury. There was no error in the denial of the motion for a verdict.

■ The respondent took an exception to the charge upon the ground that the court had failed to call the attention of the jury to the inherent infirmities of evidence concerning conversations with the respondent which took place several years before the trial. These infirmities, as stated by counsel in taking the exception, were that the witnesses might not have correctly understood, correctly remembered, or correctly repeated what was said. An examination of the charge, however, discloses that the court used this language: "Is it probable in the natural course of events that the witnesses could—this applies particularly to conversations, gentlemen—and would have heard and seen correctly, repeated accurately and testified here truthfully about the things they say they saw and heard?" This was in substance and effect what the respondent desired, and therefore the exception is unavailing. See *Barber's Admr.* v. *Bennett,* 62 Vt. 50, 59, 19 Atl. 978.

The respondent excepted to the failure of the court to instruct the jury, in accordance with his requests, that (1) "The respondent is presumed to be innocent until, on the evidence, the jury is convinced beyond a reasonable doubt that he is guilty," and (2) "The presumption of innocence avails and protects the respondent and requires a verdict of not guilty unless and until the jury is convinced beyond a reasonable doubt that he is guilty." An exception was also taken to the following instruction: "This is a criminal case and the respondent is presumed to be innocent of the crime charged. This presumption is not evidence, it simply takes the place of evidence at the start of the case and throws the burden upon the State of going ahead and introducing evidence tending to show the guilt of the respondent. When the State has introduced evidence which fairly and reasonably tends to show that the respondent is guilty of the crime charged, this presumption has served its purpose and it then quits the arena and is out of the case and is not to be considered by you in any way in deciding the case."

We held in *Tyrrell* v. *Prudential Ins. Co.*, 109 Vt. 6, 192 Atl. 184, 192, that a disputable presumption, of itself alone, contributes no evidence and has no probative quality. Its function is to shift the burden of going forward with evidence on the presumed fact to the party against whom it operates, and "when that party has produced evidence fairly and reasonably tending to show that the fact is not as presumed, the office of the presumption is performed, and the fact in question is to be established by evidence as are other questions of fact without aid from the presumption, which has become *functus officio*." A presumption of this sort does not need to be overcome by evidence; it is sufficient that enough rebutting evidence is admitted to make a question for the jury on the point involved, and when this is done the presumption disappears and goes for naught. The rule announced applies to all disputable presumptions, including the presumption of innocence.

It is true that the Tyrrell decision was in a civil case, and this is a criminal proceeding where the degree of persuasion required of the jury in order to find the respondent guilty is proof beyond a reasonable doubt. But the function of the presumption is the same in each instance. Since it has no probative value, it is not for consideration by the jury, for they are con-

cerned only with the evidence presented to them, the weight of which is for them to decide, and it is upon this alone that they must determine the question of the guilt of the respondent. It is for the court to say where the burden of proof lies and when that burden, in the sense of going forward with evidence, shifts from one party to the other. If there is no evidence fairly and reasonably tending to show guilt, the presumption of innocence requires the court to take the case from the jury, and this is because the prosecution has failed to sustain the burden of proof; but if there is such evidence it is for the jury to say whether it is of sufficient strength to exclude a reasonable doubt of guilt. The presumption, being for the court to consider in ruling whether sufficient evidence has been introduced to make it proper to submit the issue to the jury, is not an appropriate subject upon which to charge in this connection. The instruction, which was fully given in this instance, that unless the respondent's guilt was proved beyond a reasonable doubt he was entitled to an acquittal, carried with it the necessary implication that he must be assumed to be innocent until this was done. No error appears in the failure to give the requested instructions. The charge as given, though inappropriate, is not made to appear to have been prejudicial.

*Judgment affirmed.*